IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| KATHARINE ROUSE, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:11CV549 |
| | ) | |
| DUKE UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Catherine C. Eagles, District Judge.

This matter is before the Court on the Defendant's Motion for Summary Judgment. (Doc. 70.) The plaintiff, Katharine Rouse, has pending claims against the defendant, Duke University, for creation and maintenance of a hostile educational environment, negligence, negligent and intentional infliction of emotional distress, and breach of contract. The claims all concern Duke's conduct toward Ms. Rouse in the months following her rape at an off-campus party in February 2007 while she was an undergraduate student at Duke. The Court concludes that there are no disputed questions of material fact and that summary judgment is appropriate.

**FACTUAL BACKGROUND**

As is appropriate in connection with a summary judgment motion, the Court will view the evidence in the light most favorable to Ms. Rouse, the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

    **I.    January 2007 Meeting between Ms. Rouse and Dean McKay**

Ms. Rouse enrolled as a freshman at Duke University in fall 2006. (Doc. 78-2 at 19.) Early in her second semester, in January 2007, Ms. Rouse met with her academic advisor, Dean

Diane McKay, to discuss transferring out of Duke. (Doc. 78-2 at 85-86; Doc. 78-5 at 61, 94-96.) Ms. Rouse was considering transferring to Columbia University or Fordham University in New York in order to be closer to her sick mother. (Doc. 78-2 at 86, 90; Doc. 78-5 at 94.) Ms. Rouse intended at the time to transfer permanently, but she did not convey that intent to Dean McKay. (Doc. 78-2 at 90.)

Duke had a policy that students who transferred to another university were ineligible to return to Duke. Duke published its policy regarding transfer to another institution in the Duke University *Bulletin*, which provided:

> **Transfer from Duke to Another Institution**. If a student enrolled at Duke subsequently transfers to another institution as a degree-seeking student, the student will be ineligible to re-enroll as an undergraduate at Duke. Students considering transferring to another institution should discuss this with their academic dean in the early stages of their planning.

(Doc. 71-1 at 37.) Dean McKay did not mention this policy to Ms. Rouse in their January discussion. (Doc. 78-2 at 119.)

## II.  February 2007 Off-Campus Rape of Ms. Rouse

On the night of February 10, 2007, and into the early morning of February 11, Ms. Rouse attended a party at an off-campus house located at 405 Gattis Street in Durham, North Carolina. (Doc. 71-3 at 7-8; Doc. 78-25; Doc. 82-1 at 7.) A Facebook invitation for the party listed the hosts as "Phi Beta Sigma and Gattis St. Residents." (Doc. 78-25.) At around 2:45 a.m. on February 11, a man attending the party forced Ms. Rouse into a bathroom and raped her. (Doc. 69 at 4; Doc. 71-3 at 7.) After the man left the bathroom, Ms. Rouse quickly left the house and returned to her dorm. (Doc. 69 at 3.)

Members of the Duke University Police Department ("Duke Police") arrived at Ms. Rouse's dorm in response to a 4:51 a.m. call from other residents of the dorm. (Doc. 71-3 at 7,

2

9.) After transporting Ms. Rouse to the Emergency Room, Duke Police contacted the Durham Police Department ("Durham Police") so it could take over the investigation. (Doc. 69 at 2.) Duke Police informed Duke Student Affairs that Ms. Rouse had been raped, and the message was soon conveyed to Dean of Students Sue Wasiolek and Vice President for Student Affairs Larry Moneta. (Doc. 71-3 at 8-9.) Sheila Broderick, a counselor at Duke's Women's Center, met Ms. Rouse at the Emergency Department. (Doc. 71-3 at 8.) Over the next several months, Ms. Rouse periodically saw Ms. Broderick for counseling. (Doc. 78-2 at 41, 102-03, 162.)

Durham Police, with assistance from Duke Police, interviewed the residents of 405 Gattis Street, as well as other witnesses, many of whom were Duke students. (Doc. 69 at 4-5.) The investigation quickly led to the identification and arrest of suspect Michael Germaine Burch on February 19. (Doc. 69 at 6.) Though he lived in Durham and regularly played basketball at a campus gymnasium, Mr. Burch was not formally affiliated with Duke. (Doc. 82-1 at 8.) Mr. Burch eventually pled guilty to the rape of Ms. Rouse. (Doc. 78-2 at 192.)

### III. Ms. Rouse's March 2007 Leave of Absence

After the rape, Ms. Rouse went home to New York. (Doc. 78-4 at 13.) Dean McKay sent notes to Ms. Rouse's professors temporarily excusing her absence from campus. (Doc. 78-5 at 79.) Dean McKay also spoke with Ms. Rouse's mother and later Ms. Rouse to discuss her academic options for the remainder of the semester. (Doc. 71-2 at 24-25.) Ms. Rouse wanted to complete all four of her courses from home, in part because of Columbia University's requirement that transfer students complete a full academic year at their original institution before enrolling at Columbia. (Doc. 71-2 at 25; Doc. 78-2 at 97, 103.) Dean McKay secured from Columbia a waiver of that requirement for Ms. Rouse. (Doc. 78-2 at 103.)

Duke would not allow Ms. Rouse to complete any of her spring courses from home. (Doc. 78-2 at 98-99.) Ms. Rouse decided not to return to campus and took a personal leave of absence for the remainder of the semester. (Doc. 78-2 at 96.) Her intention at the time was to return to Duke in the fall. (Doc. 78-2 at 96.) Duke credited 100 percent of Ms. Rouse's tuition for the spring 2007 semester and a pro-rated portion of her room and board. (Doc. 78-2 at 137.)

### IV. Duke Administration's Disciplinary Investigation

On February 11, Vice President Moneta emailed Duke President Richard Brodhead and other senior administrators to inform them of the rape. (Doc. 78-11.) The next day, President Brodhead designated Vice President Moneta as the "point person" for the senior administration's response to the rape. (Doc. 78-12.) Dean Wasiolek instructed fellow administrator Christine Pesetski to start a Greek Judicial Board hearing for Phi Beta Sigma. (Doc. 78-13.)

On February 13, Vice President Moneta suspended a student-resident of 405 Gattis Street caught throwing drugs out of his bedroom window by officers responding to the rape report. (Doc. 69 at 4; Doc. 78-14.) Meanwhile, Duke Associate Dean of Students and Director of Judicial Affairs Stephen Bryan began gathering the names of all student-residents of 405 Gattis Street. (Doc. 78-26.) That evening, Vice President Moneta received an email from Duke donor Aubrey McClendon informing him that Mr. McClendon owned the house; Mr. McClendon was a significant financial benefactor of the university. (Docs. 78-18, 78-19, 78-20.) Vice President Moneta immediately forwarded Mr. McClendon's email, first to Duke's vice president for fundraising and development along with the message "Shit…," and then to President Brodhead along with the message "Unbelievable!" (Docs. 78-21, 78-22.) After receiving the email from Mr. McClendon, Duke did not conduct any subsequent investigation of the 405 Gattis Street party. (Doc. 78-9 at 199.)

4

At some point, Assistant Dean of Students Todd Adams spoke with the president of the fraternity, who said that the fraternity did not host the party and that the majority of the members of the fraternity were not involved in the event. (Doc. 78-8 at 25-27.) Adams concluded that Phi Beta Sigma had not hosted the party, and he apparently terminated his investigation. (*Id*.) There does not appear to have been a formal Greek Judicial Board investigation of Phi Beta Sigma, and the Board did not sanction any fraternities or students. (Doc. 78-8 at 23; Doc. 71-12.)

On February 21, 2007, Ms. Rouse's mother emailed Dean Wasiolek and Vice President Moneta, in part to emphasize the need for the "students who lived in [the 405 Gattis Street] house [to bear] some responsibility for what my daughter and I have to go through." (Doc. 78-28.) Vice President Moneta and Dean Wasiolek each responded that an investigation was in progress and would receive continued attention, but that it might not uncover enough information to take action against any student. (Doc. 78-33.) By this point, if not earlier, Dean Wasiolek was aware that punch Ms. Rouse was served at the party may have been secretly spiked with Everclear, a high-proof alcohol product. (*Id*.)

### V.     Ms. Rouse's Fall 2007 Return to Campus and Plans to Transfer

Ms. Rouse returned to Duke for the fall 2007 semester. (Doc. 78-2 at 21.) Dean McKay arranged for Ms. Rouse to retain the same priority in registration for fall classes as she would have had if she had not taken a leave of absence. (Doc. 71-4 at 3-4.) Ms. Rouse was able to register for all the classes she wanted for the fall semester. (Doc. 78-2 at 110-11.)

Just a few weeks into the semester, Ms. Rouse again considered transferring. (Doc. 78-2 at 111.) She felt uncomfortable "seeing the people that I had contact with freshman year that were still acting different around me, my friends that I had had, and just didn't feel comfortable being on campus, brought back too many memories, bad memories." (Doc. 78-2 at 112.)

5

During Ms. Rouse's employment at Duke Student Affairs, Vice President Moneta tried to avoid contact with her, despite being friendly and cordial to her before the rape. (Doc. 78-2 at 22-24.)

On October 29, Ms. Rouse informed Dean McKay by email that she was "planning on transferring, this time for real, next semester." (Doc. 71-9.) Ms. Rouse and Dean McKay met in person on November 8 to further discuss the transfer. (Doc. 71-2 at 29.) Dean McKay did not inform her of Duke's policy prohibiting a student who enrolls as a full-time student at another university from returning to Duke. (Doc. 78-2 at 132.) At no point during or after the meeting did Ms. Rouse indicate to Dean McKay that she intended to return to Duke following temporary enrollment at another institution. (*Id.* at 116-17.) Although Ms. Rouse "wasn't sure" at the time of her future academic plans, those plans were limited to "local schools back in New York." (*Id.* at 116.) She did not develop a desire to return to Duke until early 2009, over a year after her conversation with Dean McKay. (*Id.* at 116-17.)

The following day, Ms. Rouse emailed Dean McKay a formal statement of her intention to be "voluntarily transferred out of Duke University and into Fordham University as of the Spring 2008 semester." (Doc. 78-1.) According to Ms. Rouse, the text of the email was "basically scripted" for her by Dean McKay. (Doc. 78-2 at 130-31.) About a month later, Dean McKay sent a letter to Ms. Rouse, using a template she and other Duke academic deans used for students who indicated they were transferring to another institution. (Doc. 71-2 at 26; 78-5 at 186-87.) The letter confirmed that Ms. Rouse's "request to be voluntarily withdrawn from Duke University so that you may complete your undergraduate degree elsewhere" had been processed, and noted that Ms. Rouse had forfeited her "eligibility to seek readmission to Duke." (Doc. 71-2 at 26.) Ms. Rouse was surprised and angry upon receiving the letter, but did not contact Dean

6

McKay or anyone else at Duke because at the time she "didn't have any desire to go back." (Doc. 78-2 at 119-21, 189.)

Ms. Rouse enrolled at Hofstra University as a full-time student for the spring 2008 semester and graduated from Hofstra in May 2011. (Doc. 78-2 at 30, 135-36.)

## PROCEDURAL BACKGROUND

In an earlier ruling (Doc. 28), the Court dismissed a number of claims on statute-of-limitations grounds. Ms. Rouse's remaining state law claims all arise from Dean McKay's December 2007 letter. Her Title IX claim for a hostile educational environment claim covers the time from the rape in February 2007 through the sending of the letter in December 2007.

## ANALYSIS

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of establishing "the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(a)).[1]

### I. Hostile Educational Environment Claim

Title IX of the Education Amendments of 1972 provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity

---

[1] The language of Rule 56 was amended effective December 1, 2010; however, the substance of the rule did not change, and the movant's burden remains the same.

7

receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has recognized an implied private right of action under Title IX, *Cannon v. University of Chicago*, 441 U.S. 677, 709 (1979), and money damages are available in such suits. *Franklin v. Gwinnett Cnty. Pub. Schools*, 503 U.S. 60, 76 (1992). Courts frequently look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX. *See, e.g.*, *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (en banc).

A plaintiff bringing a Title IX hostile educational environment claim must show that:

> (1) she was a student at an educational institution receiving federal funds, (2) she was subjected to harassment based on her sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution.

*Id.*; *see also Wrightson v. Pizza Hut of Am., Inc.*, 99 F.3d 138, 142 (4th Cir. 1996) (reciting analogous elements for a Title VII hostile work environment claim based on sexual harassment). "If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference . . . cause[s] [the victim] to undergo harassment or make[s] [her] liable or vulnerable to it." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 644-45 (1999) (internal quotation marks omitted). An institution will be deemed deliberately indifferent to third-party harassment "only where [its] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* at 648.

Ms. Rouse alleges that Duke "created, fomented, and [was] deliberately indifferent to" a "severe, pervasive, and objectively offensive" hostile educational environment that deprived her of access to educational opportunities. (Doc. 5 at ¶¶ 54-55.) Her claim rests specifically on allegations that: Vice President Moneta made offensive comments about her rape to the media, (*id.* at ¶¶ 12-17); Duke administrators failed to take reasonable measures to ascertain the identity

8

of and discipline any Duke students who hosted or otherwise made unsafe the off-campus house party at which the rape took place, (*id.* at ¶ 25); during Ms. Rouse's spring 2007 leave of absence, Duke failed to adequately accommodate her request to complete all of her coursework from home, (*id.*at ¶¶ 21-24); Duke blocked Ms. Rouse from registering for the fall 2007 courses she wanted, (*id.*at ¶¶ 30-31); and Dean McKay tricked Ms. Rouse into forfeiting her ability to re-enroll at Duke after transferring to another undergraduate institution, (*id.*at ¶¶ 32-41).

She does not contend that Duke could or should have done more to prevent her rape or to discipline her rapist, and indeed there is no evidence to that effect. Instead, Ms. Rouse alleges that Duke reinforced or remained deliberately indifferent to a hostile educational environment created by the rape and the fraternity-affiliated party where it occurred, and that Duke's actions themselves created a hostile educational environment. Thus, her claim is based on both deliberate indifference and direct harassment.

For purposes of the present motion, the Court assumes without deciding that an educational institution's response to an off-campus rape by an unaffiliated third party may trigger Title IX institutional liability, either by direct acts or by "deliberate indifference" as defined by the Supreme Court.[2] As discussed below, Ms. Rouse has not offered evidence to support her allegations, and Duke is entitled to summary judgment on this claim.

### A. Vice President Moneta's Alleged Statement

Ms. Rouse alleges that days after her rape, Vice President Moneta said during an interview with a local television station that the rape was "[p]art of the reality of collegiate life and of experimentation and some of the consequences of students not necessarily always being in

---

[2] That said, because the "deliberate indifference" test incorporates a "clearly unreasonable in light of the known circumstances" requirement, it is inherently more difficult for a plaintiff to satisfy when the educational institution has relatively little to no control over the harasser or the context in which the harassment takes place.

9

the right place at the right time." (Doc. 5 at ¶ 12.) However, Ms. Rouse has failed to produce admissible evidence of that statement; she cites only a blog post and an excerpt from a book (Docs. 78-23, 78-24), both of which are hearsay and therefore cannot be considered at this stage. *See Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991) ("[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment.").

Moreover, there is no evidence in the record that such a statement created or exacerbated a hostile educational environment. Ms. Rouse admits she did not learn of the alleged statement until March 2008, months after she transferred to Hofstra. (Doc. 78-2 at 75.) And there is no evidence that the alleged statement influenced the attitudes of members of the Duke community toward Ms. Rouse or her rape. Thus, the alleged statement by Vice President Moneta is not a basis for imputing liability to Duke.

### B. Duke's Disciplinary Response

Ms. Rouse also alleges that Duke failed to conduct an adequate disciplinary investigation of the Phi Beta Sigma fraternity, its members, or any other students who may have been associated with the 405 Gattis Street house party. (Doc. 5 at ¶ 25.) She further contends that this failure constituted deliberate indifference and resulted in a hostile environment. The evidence is sufficient to prove that Ms. Rouse was raped at a party hosted by a Duke fraternity, that there was reason to suspect alcohol was provided by the hosts to unknowing underage women including Ms. Rouse, that this may have contributed to Ms. Rouse's rape, that Duke had supervisory authority over the fraternity and its student-members, and that Duke failed to investigate these events because the house where the rape occurred was owned by a large financial donor.

A university's response to peer harassment is only actionable if it is "deliberately indifferent" (i.e., "clearly unreasonable in light of the known circumstances") and if it "cause[s] [the victim] to undergo harassment or make[s] [her] liable or vulnerable to it." *Davis*, 526 U.S. at 644-45, 648 (internal quotation marks omitted). As a matter of law, Ms. Rouse's Title IX claim cannot be sustained on the basis of Duke's allegedly deficient disciplinary response because there is no evidence that the deficient response caused her to undergo sexual harassment or made her liable or vulnerable to it. Ms. Rouse has offered no evidence that she suffered additional sexual harassment in the months following her rape, by the rapist or by anyone else, much less that any such harassment was attributable to Duke's alleged failure to investigate. Nor has she offered any evidence that the failure to investigate had any influence on her decision to take a leave of absence in the spring or to transfer after the fall semester; indeed, her testimony is to the contrary.[3]

It is not unreasonable for a rape victim and her family to want a thorough investigation into the circumstances surrounding such a brutal crime. In general, however, "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648 (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 342-43, n.9 (1985)). More specifically, the Supreme Court has stressed that its conclusion that an educational institution may be held liable for its deliberate indifference to known acts of peer sexual harassment "does not mean that [institutions] can avoid liability only by purging their schools of actionable peer

---

[3] See Doc. 78-2 at 96, regarding her decision to take a personal leave of absence ("I just wanted some time home to just reflect on what happened, take a breath and, you know, be with my family and friends from home. And then I thought that between March and September, that was enough time for me to do those things and then come back."); and Doc. 78-2 at 112, regarding her decision to transfer ("Q: What are the factors that, just a couple weeks into the semester, are causing you to think about wanting to transfer? A: Still seeing the people that I had contact with freshman year that were still acting different around me, my friends that I had had, and just didn't feel comfortable being on campus, brought back too many memories, bad memories.").

11

harassment or that administrators must engage in particular disciplinary action." *Id.* Here, Duke cooperated fully with law enforcement in the criminal investigation of the rape and suspended a resident of the house who was found with drugs. Duke's cursory investigation of the fraternity did not cause Ms. Rouse to undergo further harassment or make her more liable or vulnerable to it, and therefore cannot serve as the basis for institutional Title IX liability. *See Davis*, 526 U.S. at 644-45.

Finally, to the extent Ms. Rouse alleges that Duke's failure to thoroughly investigate itself created a hostile educational environment and did not simply constitute deliberate indifference to the one created by the rape, there is no evidence that such failure was based on gender. To the contrary, the evidence propounded by Ms. Rouse suggests financial motives.

### C. Duke's Academic Response

Ms. Rouse additionally alleges that Duke failed to make adequate academic accommodations for her when it refused to let her finish any of her spring 2007 courses from home. (Doc. 5 at ¶¶ 20-24.) Ms. Rouse testified that despite her request, she was not allowed to finish any of her courses from home due to "the nature of the classes." (Doc. 78-2 at 97, 99.)[4] This refusal did not constitute deliberate indifference to the hostile environment created by Ms. Rouse's rape because, like the failure to investigate thoroughly, it did not cause Ms. Rouse to undergo further harassment or make her more liable or vulnerable to it. Moreover, her contention that this refusal directly created a hostile educational environment fails as a matter of law for two distinct reasons. First, it is doubtful that refusal to let a rape victim take four classes long-distance during her second semester of college constitutes *severe* harassment sufficient to

---

[4] Duke, citing Dean McKay's deposition testimony, contends that it did offer Ms. Rouse the opportunity to finish her two lecture classes long distance, pursuant to its bereavement policy, and that Ms. Rouse decided against it. (*See* Doc. 71-2 at 25; Doc. 78-5 at 111-12.)

12

create a hostile environment. This is particularly true in this case, where the record is replete with uncontradicted evidence that Duke provided substantial academic and personal support to Ms. Rouse in the wake of the sexual assault. Second, Ms. Rouse has offered no evidence that Duke's refusal was based on gender. Thus, even if Duke did refuse to allow Ms. Rouse to continue any of her courses at home, that refusal cannot supply the basis for institutional Title IX liability.

Ms. Rouse also alleges that Duke blocked her from registering for the fall 2008 courses she wanted to take. (Doc. 5 at ¶¶ 30-31.) However, she admitted during her deposition that she was able to register for those courses. (Doc. 78-2 at 110-11.)

**D. Dean McKay's December 2007 Letter**

Finally, Ms. Rouse alleges in her amended complaint that in late 2007, Dean McKay "encouraged [her] to enroll elsewhere," and after convincing Ms. Rouse to do so for the spring 2008 semester "converted Ms. Rouse's intent to take courses elsewhere in the Spring of 200[8] into a declaration of her intent to complete her degree elsewhere, and, based on that, Duke barred Ms. Rouse from 'seeking readmission to Duke.'" (Doc. 5 at ¶ 39.)[5] The evidence viewed in the light most favorable to Ms. Rouse does not support these allegations, and indeed, the record consistently and directly contradicts this characterization of the transfer discussions between Dean McKay and Ms. Rouse.

Ms. Rouse contacted Dean McKay in October 2007 to discuss "transferring, this time for real, next semester." (Doc. 71-9.) The common meaning of the word "transfer" in this context is to withdraw from a particular college or university permanently and enroll elsewhere. *See, e.g.*, *The American Heritage Dictionary of the English Language* 1844 (5th ed. 2011) (defining

---

[5] The amended complaint refers to the spring of 2007, but the surrounding context, along with Ms. Rouse's characterization of her case in her brief, makes clear that the correct year is 2008.

13

"transfer" as "[t]o withdraw from one educational institution or course of study and enroll in another"); *Random House Webster's Unabridged Dictionary* 2009 (2d ed. 2001) (defining "transfer" as "to withdraw from one school, college, or the like, and enter another"). Ms. Rouse's deposition testimony confirms that she never told Dean McKay that her enrollment at another institution was temporary or just for a semester and she never told Dean McKay that she had any intention of returning to Duke. In fact she had no intention of returning to Duke at the time and her future academic plans were limited to "local schools in New York." Moreover, there is no evidence linking Dean McKay's conduct to gender or to the rape. In light of these undisputed facts, the letter did not create a hostile educational environment.

## II. State Law Claims

Ms. Rouse's remaining state law claims for negligence, negligent and intentional infliction of emotional distress, and breach of contract arise from Dean McKay's December 2007 letter to Ms. Rouse. For each of these claims, there is no dispute of material fact and Duke is entitled to judgment as a matter of law.

### A. Negligence

The essential elements of a North Carolina negligence claim are the existence of a legal duty, breach of that duty, and injury proximately caused by that breach. *Fussell v. N.C. Farm Bureau Mut. Ins. Co.*, 364 N.C. 222, 226, 695 S.E.2d 437, 440 (2010) (internal quotation marks omitted). Dean McKay did not owe Ms. Rouse a special duty of care when discharging her role as an academic dean. *See McFadyen v. Duke Univ.*, 786 F. Supp. 2d 887, 998 (M.D.N.C. 2011) (concluding that "the university-student relationship alone does not impose an actionable duty of care on administrators or advisors in the discharge of their academic functions"), *rev'd in part on other grounds*, ___ F.3d ____, 2012 WL 6554846 (4th Cir. Dec. 17, 2012). Of course, even in

14

the absence of a special duty, "[t]he law imposes upon every person who enters upon an active course of conduct the positive duty to exercise ordinary care to protect others from harm, and calls a violation of that duty negligence." *Council v. Dickerson's, Inc.*, 233 N.C. 472, 474, 64 S.E.2d 551, 553 (1951). But such a duty "extends only to causes of injury that were reasonably foreseeable and avoidable through the exercise of due care." *Fussell*, 364 N.C. at 226, 695 S.E.2d at 440.

Ms. Rouse testified in her deposition that she thought that she could successfully return to Duke for her sophomore year but that being on campus brought back bad memories, made her uncomfortable, and led her to want to transfer. She admitted that she had no intention at the time of ever returning to Duke, and that she did not convey any such intention to Dean McKay. Since Ms. Rouse told Dean McKay that she wanted to transfer, Dean McKay had no reason to believe Ms. Rouse would want to re-enroll at Duke, and Ms. Rouse did not at the time have any intention to return to Duke, Ms. Rouse cannot show that Duke violated any duty of care in sending the letter or that the letter caused her any reasonably foreseeable injury. Therefore, the negligence claim fails as a matter of law.

### B. Negligent Infliction of Emotional Distress

"To state a claim for negligent infliction of emotional distress, a plaintiff must allege that (1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress, and (3) the conduct did in fact cause the plaintiff severe emotional distress." *McAllister v. Ha*, 347 N.C. 638, 645, 496 S.E.2d 577, 582-83 (1998) (internal quotation marks and alterations omitted).

For the reasons discussed *supra*, Ms. Rouse cannot establish either that Dean McKay acted negligently in sending the December 2007 letter or that it was reasonably foreseeable that

15

the letter would cause Ms. Rouse severe emotional distress. Additionally, Ms. Rouse testified that, though "surprised" and "angry," (Doc. 78-2 at 189), she "wasn't really worried about" the letter when she received it because she "did not have a desire to go back." (*Id.* at 119-21.) This response cannot be characterized as severe emotional distress, and Ms. Rouse's declaration that she is "personally certain" the letter "compounded and exacerbated" distress she suffered as a result of her rape is insufficient to create a triable issue of material fact. *See Williams v. HomEq Servicing Corp.*, 184 N.C. App. 413, 419-20, 646 S.E.2d 381, 385 (2007) (defining "severe emotional distress" as "any emotional or mental disorder . . . or any other type of *severe and disabling* emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so," and affirming the trial court's grant of summary judgment for the defendant because plaintiffs "offered no real evidence of severe emotional distress" (internal quotation marks omitted)). Duke is therefore entitled to summary judgment on the negligent infliction of emotional distress claim.

### C. Intentional Infliction of Emotional Distress

"The essential elements of an action for intentional infliction of emotional distress are 1) extreme and outrageous conduct by the defendant 2) which is intended to and does in fact cause 3) severe emotional distress." *Waddle v. Sparks*, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992) (internal quotation marks omitted). "The determination whether conduct rises to the level of extreme and outrageous behavior is a question of law." *Foster v. Crandell*, 181 N.C. App. 152, 168, 638 S.E.2d 526, 537 (2007).

As discussed *supra*, the record does not establish any basis for finding that Ms. Rouse suffered severe emotional distress as a result of Dean McKay's letter. Also, as discussed *supra*, there is no evidence that Dean McKay coerced, duped, or tricked Ms. Rouse into transferring

from Duke and forfeiting her ability to reenroll.  Instead, the undisputed facts show that Ms. Rouse initiated the transfer discussions and intended to transfer permanently, and that Dean McKay sent her a form letter using a template she and other Duke academic deans used for any transferring students.  Dean McKay's actions do not amount to extreme and outrageous conduct. *See Briggs v. Rosenthal*, 73 N.C. App. 672, 677, 327 S.E.2d 308, 311, *cert. denied*, 314 N.C. 114, 332 S.E.2d 479 (1985) (explaining that to be extreme and outrageous, conduct must "go beyond all possible bounds of decency, and . . . be regarded as atrocious, and utterly intolerable in a civilized community" (citing Restatement (Second) of Torts § 46, cmt. d)).  Here, too, Duke is entitled to summary judgment.

### D. Breach of Contract

The Court previously narrowed the scope of Ms. Rouse's breach of contract claim to her contention that the reason Duke asserted for terminating her status as a student—her desire to withdraw from Duke and complete her undergraduate degree elsewhere—was not factually correct.  (*See* Doc. 28 at 10-13.)  The record now makes clear that Ms. Rouse told Dean McKay she intended to transfer to another school and did not tell Dean McKay or anyone else at Duke that she had any intention of returning to Duke.  As there is no evidence to support the allegations in the complaint, summary judgment for Duke on this claim is appropriate.

For the foregoing reasons, it is **ORDERED** that Duke University's Motion for Summary Judgment against Katharine Rouse, (Doc. 70), is **GRANTED**.

This 21st day of December, 2012.

							                  _____
							                  UNITED STATES DISTRICT JUDGE